UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARY FOLTICE,

               Plaintiff,                                   Hon. Gordon J. Quist

v.                                                 Case No. 1:10-CV-602

COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.

_____/


**REPORT AND RECOMMENDATION**

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits under

Titles II and XVI of the Social Security Act.  Section 405(g) limits the Court to a review of the

administrative record, and provides that if the Commissioner's decision is supported by substantial

evidence, it shall be conclusive.  Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States

Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social

security appeals, the undersigned recommends that the Commissioner's decision be **affirmed**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This

standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff was 38 years of age at the time of the ALJ's decision. (Tr. 13P, 81). She successfully completed high school, as well as three years of college, and worked previously as a receptionist, officer clerk, pharmacy technician, and armored car driver/guard. (Tr. 13N, 99, 104, 110-16).

Plaintiff applied for benefits on August 4, 2005, alleging that she had been disabled since June 2005, due to fibromyalgia, arthritis, and acid reflux. (Tr. 41, 81-86, 98). Plaintiff's applications were denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 14-80). On April 28, 2008, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff and vocational expert, David Holwerda. (Tr. 689-740). In a written decision dated July 22, 2008, the ALJ determined that Plaintiff was not disabled. (Tr. 13A-13P). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 7-10). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the ALJ's decision.

## RELEVANT MEDICAL HISTORY

X-rays of Plaintiff's cervical spine, taken on April 22, 2003, revealed "minimal changes" from C5 through C7. (Tr. 380). An MRI examination of Plaintiff's cervical spine,

performed the same day, revealed "minimal degenerative disc changes at C5-6 and C6-7" with no evidence of herniation, stenosis, or significant neural element impingement.  (Tr. 379).

On January 2, 2004, Plaintiff reported to the Emergency Room complaining of abdominal pain.  (Tr. 170-73).  The results of a physical examination were unremarkable and Plaintiff was "in no acute distress."  (Tr. 170).  Plaintiff was given morphine[1] and Toradol[2] and discharged home.  (Tr. 170).

On July 11, 2004, Plaintiff reported to the Emergency Room complaining of nausea, chest pain and shortness of breath.  (Tr. 179-83).  Plaintiff was "in no acute distress" and the results of a neurologic exam were "normal."  (Tr. 179).  The results of a physical examination were unremarkable. (Tr. 179).  Plaintiff was given morphine and Phenergan[3] and discharged home.  (Tr. 179).  On July 18, 2004, Plaintiff reported to the Emergency Room complaining of dizziness.  (Tr. 184-86).  Plaintiff was "alert and in no acute distress" and the results of a physical examination were unremarkable.  (Tr. 184).  Plaintiff was given medication which produced "good improvement of her dizziness."  (Tr. 184).  Plaintiff "then requested something for the head pain" at which point she was given morphine and discharged home.  (Tr. 184-85).

On October 3, 2004, Plaintiff reported to the Emergency Room complaining of head and neck pain.  (Tr. 187-89).  Plaintiff rated her pain as 10/10, but the results of a physical

---

[1] Morphine is a narcotic pain reliever which works by dulling the pain perception centers in the brain.  *See Morphine*, available at http://www.drugs.com/morphine.html (last visited on August 9, 2011).

[2] Toradol is a nonsteroidal anti-inflammatory pain medication.  *See* Toradol, available at http://www.drugs.com/toradol.html (last visited on July 31, 2011).

[3] Phenergan is an antihistamine which is used to treat allergy symptoms, motion sickness, and nausea.  *See* Phenergan, available at http://www.drugs.com/phenergan.html (last visited on July 31, 2011).  Phenergan is also used as a sedative or sleep aid.  *Id.*

examination were unremarkable. (Tr. 187). Plaintiff was given morphine, Valium,[4] Toradol, and Phenergan. (Tr. 187). Plaintiff then reported that her pain was 2-3/10 at which point she was discharged home. (Tr. 187).

On October 24, 2004, Plaintiff reported to the Emergency Room complaining of headache and neck pain. (Tr. 190-92). Plaintiff reported that her pain was "constant and 10 out of 10." (Tr. 190). The results of a physical examination were unremarkable. (Tr. 190). Plaintiff also participated in a CT scan of her head the results of which were "normal." (Tr. 191). Plaintiff was given morphine, Valium, and Phenergan. (Tr. 191). This provided Plaintiff "some initial relief of pain" and "she was able to sleep well in the Emergency Department." (Tr. 191). Two hours later, however, Plaintiff "began requesting more pain medication." (Tr. 191). This request was denied and Plaintiff "was discharged home in stable condition." (Tr. 191).

On November 20, 2004, Plaintiff reported to the Emergency Room complaining of a toothache and neck pain. (Tr. 193-95). Plaintiff exhibited "full range of [neck] motion" with no evidence of cervical adenopathy or cervical spine tenderness. (Tr. 193). Plaintiff rated her pain as 10/10, but the results of a physical examination were unremarkable. (Tr. 193). The doctor determined that Plaintiff's impairment "appears muscular in nature." (Tr. 193). Plaintiff was given morphine, Valium, Phenergan, and Toradol after which she was discharged home in "stable condition." (Tr. 193-94).

On December 21, 2004, Plaintiff reported to the Emergency Room complaining of a headache. (Tr. 196-98). Plaintiff rated her pain as 10/10. (Tr. 196-98). The results of a physical

---

[4] Valium belongs to a class of drugs which act on the brain and central nervous system to "produce a calming effect." *See Valium*, available at http://www.webmd.com/drugs/drug-11116-Valium+Oral.aspx?drugid=11116&drugname=Valium+Oral (last visited on August 9, 2011). Valium is used to treat anxiety, acute alcohol withdrawal, seizures, and muscle spasms, as well as to provide sedation before medical procedures. *Id.*

examination were unremarkable.  (Tr. 196).  Plaintiff was given Dilaudid[5] and Phenergan after which she was "discharged in stable condition."  (Tr. 196).  On December 23, 2004, Plaintiff reported to the Emergency Room complaining of tooth pain.  (Tr. 199-201).  An examination of Plaintiff's teeth revealed "decay" of one particular tooth, but the results of a physical examination were otherwise unremarkable.  (Tr. 199).  Plaintiff was given morphine and other medication after which she was discharged in "stable" condition.  (Tr. 199-200).

On February 13, 2005, Plaintiff reported to the Emergency Room complaining of a headache.  (Tr. 202-04).  The results of a physical examination were unremarkable.  (Tr. 202).  Plaintiff was given Toradol, Phenergan, and Valium after which she was discharged in "improved" condition.  (Tr. 202).  On March 7, 2005, Plaintiff reported to the Emergency Room complaining of the flu.  (Tr. 205-09).  Plaintiff appeared to be experiencing "mild distress," but the results of a physical examination were otherwise unremarkable.  (Tr. 205).  Plaintiff was given morphine and other medication after which she was discharged home.  (Tr. 205-06).

On March 9, 2005, Plaintiff reported to the Emergency Room complaining of "nausea, headache, and generalized body aches."  (Tr. 210-13).  Plaintiff was "in no acute distress" and the results of a physical examination were unremarkable.  (Tr. 210-11).  Plaintiff was given morphine and Phenergan.  (Tr. 211).  Plaintiff reported that this provided "only temporary" relief of her headache at which point she was given another dose of morphine.  (Tr. 211).  Plaintiff again reported that the morphine provided her only "temporary relief of her headache."  (Tr. 211).  Plaintiff was then given Vicodin and discharged in "good" condition.  (Tr. 211).

---

[5]   Dilaudid is a narcotic pain medication "similar to morphine."   *See* Dilaudid, available at http://www.drugs.com/dilaudid.html (last visited on July 31, 2011).

6

On March 29, 2005, Plaintiff reported to the Emergency Room complaining of "a lump in her breast." (Tr. 214-16). Plaintiff reported that since discovering the lump while taking a shower the previous day, she had experienced "increased pain in her chest that is going to her back and to her shoulder." (Tr. 214). An examination of Plaintiff's breast revealed no evidence of a lump. (Tr. 214). Likewise, Plaintiff "was also unable to palpate the supposed lump as well during the breast exam." (Tr. 214). The doctor stated that he was "unsure exactly what is causing her pain." (Tr. 214). Plaintiff was given morphine and Vistaril[6] and discharged home. (Tr. 214-15).

On April 1, 2005, Plaintiff participated in an MRI of her cervical spine the results of which revealed "no evidence for significant disc bulge, focal disc herniation or central spinal canal stenosis." (Tr. 377).

On May 20, 2005, Plaintiff reported to the Emergency Room complaining of a head injury. (Tr. 217-19). Specifically, Plaintiff reported that she "stood up and hit the bottom of the freezer drawer that had broken yesterday, striking the vertex of her head." (Tr. 217). An examination revealed "no swelling or breaks in the skin." (Tr. 217). Plaintiff participated in a CT scan of her head, the results of which were "unremarkable." (Tr. 217). X-rays of Plaintiff's cervical spine were, likewise, "negative." (Tr. 217). Plaintiff was "in no acute distress" and the results of a physical examination were unremarkable. (Tr. 217). Plaintiff nonetheless "did request pain medication." (Tr. 217). Plaintiff was given Toradol and Phenergan, but she "repeatedly asked for narcotic injections." (Tr. 217). The doctor denied Plaintiff's request for narcotics, but instead offered Plaintiff Vicodin, Motrin, and Flexeril. (Tr. 217). Plaintiff refused these medications and

_____

[6] Vistaril "reduces activity in the central nervous system" and is "used as a sedative to treat anxiety and tension." *See Vistaril*, available at http://www.drugs.com/vistaril.html (last visited on August 9, 2011).

was discharged in "stable" condition.  (Tr. 217).  X-rays of Plaintiff's cervical spine, taken on June 10, 2005, were "normal."  (Tr. 376).

On June 10, 2005, Dr. Farook Kidwai, one of Plaintiff's treating physicians, reported that Plaintiff could work subject to the following limitations: (1) avoid repetitive bending and twisting of the neck; (2) do not engage in prolonged flexed posture of the cervical spine; (3) if sitting at a computer or television, the terminal should be at eye level; and (4) she cannot lift more than 30 pounds.  (Tr. 419).

On June 25, 2005, Plaintiff reported to the Emergency Room complaining of headaches.  (Tr. 229-34).  The results of a physical examination were unremarkable.  (Tr. 230-32). Plaintiff was given Toradol, Vistaril, and morphine after which she was discharged home in stable condition.  (Tr. 233).  On July 2, 2005, Plaintiff reported to the Emergency Room complaining of chronic neck pain.  (Tr. 273-74).  The results of a physical examination were unremarkable.  (Tr. 273).  Plaintiff was given morphine and Phenergan after which she was discharged home.  (Tr. 273). Treatment notes dated July 14, 2005, indicate that Plaintiff's impairments "are primarily myofascial in nature."  (Tr. 481).

On July 16, 2005, Plaintiff reported to the Emergency Room complaining of a headache.  (Tr. 265-66).  The results of a physical examination were unremarkable.  (Tr. 265). Plaintiff was given Toradol and Phenergan.  (Tr. 265-66).  Plaintiff reported that this only "moderately decreased her pain level."  (Tr. 266).  Plaintiff then became "argumentative" and began "requesting morphine."  (Tr. 266).  The Emergency Room doctor suggested to Plaintiff that she telephone her primary care physician to discuss the matter, but Plaintiff "refuse[d] to do this and left with her significant other."  (Tr. 266).

On August 20, 2005, Plaintiff participated in an MRI examination of her brain the results of which were "normal." (Tr. 420).

On August 25, 2005, Plaintiff reported to the Emergency Room complaining of "a headache and stiff neck." (Tr. 258-59). Plaintiff reported that she was "concerned about meningitis." (Tr. 258). A sample of spinal fluid was obtained which revealed "no evidence of meningitis." (Tr. 258). The results of a physical examination were unremarkable. (Tr. 258). Plaintiff was given morphine and Vicodin after which she was discharged home. (Tr. 258).

On September 1, 2005, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed "no disc protrusion, significant disc bulging or evidence of central canal stenosis." (Tr. 374).

On September 15, 2005, Plaintiff reported to the Emergency Room complaining of a headache. (Tr. 254-55). Plaintiff appeared to be experiencing "a mild amount of discomfort," but the results of a physical examination were unremarkable. (Tr. 254-55). Plaintiff was given morphine and Phenergan after which she was discharged home in "stable" condition. (Tr. 255).

On September 24, 2005, Plaintiff reported to the Emergency Room complaining of neck pain. (Tr. 246-47). An examination of Plaintiff's neck revealed "generalized tenderness across the entire back of her neck," but the results of a physical examination were otherwise unremarkable. (Tr. 246). Plaintiff was given morphine, Phenergan, and Valium. (Tr. 247). Plaintiff was later given Toradol, as well as an additional dosage of morphine and Valium after which she was discharged home. (Tr. 247).

On September 26, 2005, Plaintiff reported to the Emergency Room complaining of neck pain. (Tr. 248-49). Plaintiff rated her pain as 10/10. (Tr. 248). The doctor reported that

9

Plaintiff was "a very pleasant female who was sitting up, talking with a friend, and in no acute distress." (Tr. 248).  The results of a physical examination were unremarkable. (Tr. 248).  Plaintiff was given morphine and Phenergan after which she was discharged in "stable condition." (Tr. 249).

On October 3, 2005, Plaintiff reported to the Emergency Room complaining of head and neck pain.  (Tr. 242-43).  Plaintiff appeared to be in "mild distress." (Tr. 242).  The results of a physical examination were unremarkable and the doctor further noted that MRIs, CT scans, x-rays, and lumbar puncture procedures have all "been essentially normal." (Tr. 242).  The doctor then "had a long discussion" with Plaintiff and her husband "about the concerning nature of the increased frequency of her Emergency Department visits for narcotic pain control." (Tr. 242).  In response, Plaintiff and her husband became "quite angry" with the doctor.  (Tr. 242).  The doctor then suggested to Plaintiff that she contact her primary physician "to establish a care plan for the Emergency Department." (Tr. 242).  Plaintiff "stated she was not willing to do this." (Tr. 242).  The Emergency Room doctor "stressed again [to Plaintiff] the need of the primary care physician to direct her pain medication control and further diagnostic and specialist work up." (Tr. 242).  Nevertheless, Plaintiff was given morphine, Phenergan, and Toradol after which she was "discharged home in stable condition." (Tr. 243).

On October 14, 2005, Plaintiff reported to the Emergency Room complaining of head and neck pain.  (Tr. 238-39).  The results of a physical examination were unremarkable.  (Tr. 238).  Plaintiff was given morphine, Phenergan, and Toradol after which she was discharged "in stable condition." (Tr. 238).

On November 10, 2005, Plaintiff reported to the Emergency Room complaining of abdominal pain.  (Tr. 284-85).  An examination of Plaintiff's abdomen revealed "mild tenderness,"

but the results of a physical examination were otherwise unremarkable. (Tr. 284). Plaintiff was given Phenergan and Pepcid after which Plaintiff "continued to complain of a moderate amount of abdominal cramping and a headache." (Tr. 284). Plaintiff was then given morphine and discharged home in "stable" condition. (Tr. 284-85).

On March 14, 2006, Plaintiff participated in an MRI examination of her lumbar spine the results of which were "normal." (Tr. 373).

On May 9, 2006, Plaintiff was examined by Dr. Gary Rich, a psychiatrist with Pine Rest Christian Mental Health Services. (Tr. 394-97). Plaintiff reported that she recently began participating in counseling with Brandee Peikert who referred her to Dr. Rich for "a medication evaluation." (Tr. 394). Plaintiff appeared "somewhat anxious and depressed," but the results of a mental status examination were otherwise unremarkable. (Tr. 396). Dr. Rich specifically observed that Plaintiff's "memory, concentration, general fund of knowledge and ability to abstract are grossly intact." (Tr. 396). Plaintiff was diagnosed with: (1) major depressive disorder; (2) post-traumatic stress disorder; and (3) panic disorder. (Tr. 396). Her GAF score was rated as 50-55.[7] (Tr. 396). Plaintiff was prescribed Remeron[8] and instructed to continue counseling with Ms. Peikert. (Tr. 397). Following examinations by Dr. Rich on June 7, 2006, and August 15, 2006, Plaintiff's medication regimen was modified. (Tr. 392-93).

---

[7] The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994) (hereinafter DSM-IV). A GAF score of 50 indicates that the individual is experiencing "serious symptoms or any serious impairment in social, occupational, or school functioning." A GAF score of 55 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

[8] Remeron is a tetracyclic antidepressant that "affects chemicals in the brain that may become unbalanced and cause depression." *See Remeron*, available at http://www.drugs.com/remeron.html (last visited on August 9, 2011).

On July 18, 2006, Plaintiff participated in a stress echocardiogram examination. (Tr. 322-23). Plaintiff exhibited "mild symptoms of left sided chest discomfort of a pleuritic nature," but "no significant structural valvular abnormalities were noted" and Plaintiff exhibited "well preserved functional aerobic capacity." (Tr. 323).

On August 21, 2006, Plaintiff was examined by Dr. Darryl Varda with Neurological Associates of West Michigan, PC. (Tr. 328-30). Plaintiff exhibited full range of motion in her neck and extremities. (Tr. 329). Straight leg raising was negative. (Tr. 239). Lhermitte's sign[9] was negative. (Tr. 329). There was no evidence of arthritic or inflammatory changes. (Tr. 329). Plaintiff exhibited normal strength with no evidence of atrophy or fasciculations. (Tr. 330). There was likewise no evidence of sensory impairment. (Tr. 330). Dr. Varda concluded that the results of his neurological examination of Plaintiff were "normal." (Tr. 330).

On September 6, 2006, Plaintiff participated in a neurosurgical consultation performed by Dr. J. Eric Zimmerman. (Tr. 334-35). Plaintiff exhibited normal strength and reflexes. (Tr. 334). Spurling's maneuver[10] and Lhermitte's sign were both negative. (Tr. 334). Dr. Zimmerman concluded that Plaintiff "has myofascial arthritic pain or pain related to fibromyalgia," but "no neurologic deficit." (Tr. 335). The doctor further noted that he did "not see any evidence other than very mild to [at] most moderate degenerative joint changes not incompatible with her age." (Tr. 335).

---

[9] Lhermitte's sign consists of twinges resembling a mild electrical shock felt in various parts of the body. It is observed in cases of multiple sclerosis and irritation and thickening of the membranes covering the brain and spinal cord, as well as other demyelinating diseases (i.e., diseases in which the myelin covering of nerves is lost). J.E. Schmidt, *Schmidt's Attorneys' Dictionary of Medicine* L-100 (Matthew Bender) (1996).

[10] A positive Spurling's test suggests the presence of a cervical nerve root disorder. Thomas W. Woodward, M.D., and Thomas M. Best, M.D., Ph.D., *The Painful Shoulder: Part I Clinical Evaluation*, American Family Physician, May 15, 2000, *available at*, http://www.aafp.org/afp/20000515/3079.html (last visited August 9, 2011).

On September 13, 2006, Plaintiff was examined by Dr. Rich.  (Tr. 391).  Plaintiff reported that her panic attacks were under "better" control.  (Tr. 391).  Plaintiff also reported that she "has a job interview later today, which would be an office job at a trucking company."  (Tr. 391).  Plaintiff stated that "she wants to work about 20 to 25 hours per week."  (Tr. 391).

On October 1, 2006, Plaintiff participated in a CT scan of her head the results of which were "normal."  (Tr. 352).  On October 16, 2006, Plaintiff participated in another CT scan of her head the results of which were "negative."  (Tr. 342).

On January 3, 2007, Plaintiff reported to Dr. Rich that she "is working about 23 hours per week."  (Tr. 390).

X-rays of Plaintiff's chest, taken on March 19, 2007, revealed "no evidence of acute pulmonary disease."  (Tr. 504).

On May 2, 2007, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed a "small left-sided disc protrusion at C6-7" which the doctor concluded "hardly looks large enough to produce [Plaintiff's] left arm symptoms."  (Tr. 372).

On June 6, 2007, Plaintiff participated in an electromyography examination.  (Tr. 362).  This examination revealed the following: (1) no electrodiagnostic evidence of carpal tunnel syndrome, ulnar neuropathy or ulnar nerve compression of either elbow; (2) no electrodiagnostic evidence of polyneuropathy; and (3) "mild, stable bilateral C5 radiculopathies without evidence of recent denervation in this root muscle."  (Tr. 362).

On June 12, 2007, Dr. Kidwai reported that Plaintiff could perform work activities subject to the following limitations: (1) avoid repetitive bending and twisting of the neck and lower back; (2) refrain from prolonged flexed posture of the cervical spine; (3) if sitting at a computer or

13

television, the terminal should be a eye level; (4) she should refrain from prolonged sitting, standing, walking, stooping, or driving for more than one hour at a time; and (5) she should not lift more than 30 pounds.  (Tr. 409).

On August 12, 2007, Plaintiff participated in a CT scan of her cervical spine the results of which revealed "minimal degenerative changes" at C1-2.  (Tr. 371).  The results of the examination were otherwise "negative."  (Tr. 371).

On October 2, 2007, Plaintiff participated in an MRI examination of her lumbar spine the results of which revealed "very minimal facet arthrosis at the L4-L5 and the L5-S1 levels."  (Tr. 370).  This examination was "otherwise unremarkable."  (Tr. 370).

Treatment notes authored by Dr. Rich on October 8, 2007, revealed that Plaintiff was neither taking her prescribed medication nor participating in counseling.  (Tr. 387).

On November 6, 2007, Plaintiff was examined by Dr. Carla Hemphill-Harris.  (Tr. 552).  Plaintiff reported that she was experiencing bilateral knee pain, the severity of which was often "10/10."  (Tr. 552).  An examination of Plaintiff's knees revealed "a little bit of effusion bilaterally in her knee, but no obvious deformities, redness or swelling."  (Tr. 552).  Plaintiff's gait was "normal" and she exhibited "good range of motion" in both knees.  (Tr. 552).  X-rays of Plaintiff's knees were "normal."  (Tr. 499-500).

On December 31, 2007, Plaintiff participated in an MRI examination of her cervical spine the results of which revealed "unchanged appearance of a small bulging disc at C6-7 on the left with very minimal narrowing of the neural foramen at C6-7 on the left."  (Tr. 629).

At the administrative hearing, Plaintiff testified that she experiences dizziness, weakness, fatigue, and has "a hard time getting out of bed."  (Tr. 709).  Plaintiff also reported

experiencing anxiety and "crying bouts...at least every other day" which last 15 to 20 minutes.  (Tr.

714).  Plaintiff reported that she experiences anxiety attacks "everyday."  (Tr. 715).  Plaintiff also

reported that she experiences "maybe five" headaches a week which last anywhere from one day to

seven days.  (Tr. 718-19).  Plaintiff testified that she was unable to work because she "would miss

so much time off work" due to her various impairments.  (Tr. 722).  Plaintiff testified that she could

"probably" lift 10 pounds "at the most."  (Tr. 723).  She reported that she was able to sit for 15 to

30 minutes and walk for "maybe a half hour."  (Tr. 723).


## ANALYSIS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff suffers from (1) degenerative disc disease

involving the neck and low back; (2) headaches; (3) an affective disorder; and (4) an anxiety

disorder, severe impairments that whether considered alone or in combination with other

impairments, failed to satisfy the requirements of any impairment identified in the Listing of

Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 13G-13J).  The ALJ

concluded that while Plaintiff was unable to perform her past relevant work, there existed a

significant number of jobs which she could perform despite her limitations.  (Tr. 13J-13O).

Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security

Act.

The social security regulations articulate a five-step sequential process for evaluating

disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[11]  If the Commissioner can make a

---

[11] 1.  An individual who is working and engaging in substantial gainful activity will not be found to be "disabled"
        regardless of medical findings (20 C.F.R. 404.1520(b));

   2.  An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

15

dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).   The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining her residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted, the Commissioner has established a five-step disability determination procedure.  While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff retained the capacity to perform unskilled work subject to the following limitations: (1) she

---

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.   If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.   If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

can lift up to 25 pounds occasionally and 10 pounds frequently; (2) she should avoid repetitive bending and twisting of her neck and low back; (3) she should refrain from flexed posture of her cervical spine; (4) if she is sitting at a computer or television, her terminal should be at eye level; and (5) she should refrain from prolonged sitting, standing, walking, stooping, or driving for more than one hour at a time, and after each such period of activity she should either change her pace or take a "few minutes'" break.  (Tr. 13J).  After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff could not perform her past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding.  *See Richardson*, 735 F.2d at 964.  While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added).  This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy.  *See Richardson*, 735 F.2d at 964.  Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert David Holwerda.

The vocational expert testified that there existed approximately 25,900 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 725, 731-34).  This represents a significant number of jobs.  *See Born v. Sec'y*

17

*of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006).  The vocational expert further testified that Plaintiff would be able to perform all the previously identified jobs even if she were further limited in that she could lift no more than 10 pounds, required a sit/stand option, and was unable to repetitively bend or twist.  (Tr. 734).

> a.      The ALJ Properly Assessed the Medical Evidence

Plaintiff asserts that because Dr. Rich was her treating physician, the ALJ was required to afford controlling weight to the doctor's conclusion that she experiences a "marked inability to stay on task."  (Dkt. #10 at 10-11).  The Court notes that in articulating this particular argument, Plaintiff has failed to identify *any* portion of the record in support thereof.  (Dkt. #10 at 10-12).  The Court is left, therefore, to guess as to which portion(s) of the record Plaintiff relies in support of this argument.  It *appears* from Plaintiff's discussion of the medical record in an earlier section of her brief (as well as the ALJ's discussion of Dr. Rich's opinion) that Plaintiff is relying on a report that Dr. Rich completed on May 10, 2006.  (Dkt. #10 at 4).  In the absence of anything to the contrary in Plaintiff's pleadings or the administrative record, the Court shall assume that such is the case.

On May 10, 2006, Dr. Rich completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations.  (Tr. 641-54).  Determining that Plaintiff suffered from a depressive syndrome and anxiety, the doctor concluded that Plaintiff satisfied the Part A criteria for Section 12.04 (Affective Disorders) and Section 12.06 (Anxiety-Related Disorders) of the Listing of Impairments.  (Tr. 642-50).  With respect to the Part B criteria for these particular Listings, the

doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, marked difficulties in maintaining concentration, persistence or pace, and experienced one or two episodes of decompensation. (Tr. 651).

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). An ALJ must, therefore, "give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data." *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)). The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Wilson*, 378 F.3d at 544. In articulating such reasons, the

19

ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *See* 20 C.F.R. §§ 404.1527, 416.927; *see also*, *Wilson*, 378 F.3d at 544. The ALJ is not required, however, to explicitly discuss each of these factors. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007). Instead, the record must reflect that the ALJ considered those factors relevant to her assessment. *See Oldham*, 509 F.3d at 1258; *Undheim*, 214 Fed. Appx. at 450.

The ALJ evaluated Dr. Rich's opinion and concluded that it merited less than controlling weight. Specifically, the ALJ concluded:

> Because Dr. Rich is a treating medical source, significant deference would generally be accorded to his opinion. Dr. Rich's treatment records, however, do not support his conclusions set forth in Exhibit 51F. While the doctor has indicated that the claimant has marked difficulties in maintaining concentration, persistence, or pace, the supporting narrative does not reflect impairment in cognitive functioning to such an extent. Dr. Rich has remarked concerning the claimant's ongoing struggle with anxiety and has reported that the claimant has denied any homicidal or suicidal ideation and that her insight is limited. He has provided no information, however, concerning her concentration, persistence, or pace in his office notes. Rather, during an evaluation of May 9, 2006, Dr. Rich stated that the claimant's memory, concentration, general fund of knowledge and ability to abstract were grossly intact (Exhibit 37F/13). Moreover, there is no documentation of an episode or episodes of decompensation in Dr. Rich's Pine Rest records. Because of the inconsistencies of Dr. Rich's opinion with his narrative reports, Dr. Rich's opinion is not given controlling weight.

(Tr. 13M).

Plaintiff argues that the ALJ's analysis is contrary to relevant Social Security regulations. Specifically, Plaintiff asserts that the ALJ failed to comply with the following provision:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 404.1527(d)(2).

Plaintiff argues that the ALJ must afford controlling weight to Dr. Rich's opinion unless "Dr. Rich's records had *affirmatively denied* any decompensation episodes, or had documented Plaintiff's ability to stay on track." (Dkt. #10 at 10). Plaintiff asserts that absent such an inconsistency, the ALJ was required to afford controlling weight to the doctor's opinion. According to Plaintiff, there exists a significant difference between "lack of corroboration" (upon which the ALJ allegedly relied) and "inconsistency" which Plaintiff asserts is the only legitimate basis for discounting a treating physician's opinion. (Dkt. #10 at 10-11).

Plaintiff's argument is unpersuasive for several reasons. First, Plaintiff cites no authority to support her interpretation of the previously cited regulation. Second, the Social Security regulations indicate that lack of corroboration is an appropriate consideration when evaluating a treating source's opinion. *See* 20 C.F.R. § 404.1527(d)(3)-(d)(4). The Court also finds Plaintiff's interpretation or definition of the concepts of "lack of corroboration" and "inconsistency" to be unreasonable and unsupported. The Court does not find the two concepts to be mutually exclusive as Plaintiff suggests, but instead finds that the two concepts significantly overlap.

Moreover, Plaintiff's argument ignores the portion of the language quoted above that requires a treating source's opinion to be "well-supported."  Employing Plaintiff's logic, an ALJ is required to afford controlling weight to a treating source's opinion, even if such enjoys absolutely no support in the medical record, so long as the record does not contain anything which directly and expressly contradicts such.  Plaintiff has identified no authority that supports such an unreasonable position.  Finally, Plaintiff's argument is contrary to the Sixth Circuit authority cited above which provides that an ALJ can reject a treating source's opinion where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence.

The ALJ's rationale for discounting Dr. Rich's opinion enjoys overwhelming support in the record.  Dr. Rich's opinion enjoys no support in the medical record and is contradicted by his own contemporaneous treatment notes, including but certainly not limited to his May 9, 2006 observation that Plaintiff's "memory, concentration, general fund of knowledge and ability to abstract are grossly intact."  As the ALJ also correctly concluded, Dr. Rich's opinion is contradicted by the opinions expressed by Dr. Kidwai, another of Plaintiff's treating physicians.  (Tr. 13L-13M).  In sum, the ALJ articulated good reasons, supported by substantial evidence, for affording less than controlling weight to Dr. Rich's opinion.


          b.       The ALJ Properly Discounted Plaintiff's Subjective Allegations

As previously noted, Plaintiff testified at the administrative hearing that she is impaired to an extent far beyond that recognized by the ALJ.  The ALJ, however, discounted Plaintiff's subjective allegations on the ground that Plaintiff was not credible.  (Tr. 13J-13K).  Plaintiff argues that the ALJ improperly discounted her subjective allegations.

22

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same).   As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled."   20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed. Appx. 981, 989 (6th Cir., Feb. 10, 2009).  Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition.   If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted).  This standard is often referred to as the *Duncan* standard. *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

23

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

In support of her argument that the ALJ was required to grant her application for benefits based on her subjective allegations, Plaintiff again argues that the ALJ's analysis is flawed because he merely identified a "lack of corroboration" for Plaintiff's allegations rather than a direct "contradiction" thereof. Again, Plaintiff identifies no authority supporting her interpretation of the relevant authority. Plaintiff's argument is likewise contrary to the controlling authority identified above and defies common sense.

As the medical evidence detailed above reveals, Plaintiff's subjective allegations, to the extent such are inconsistent with her RFC, enjoy little (if any) support in the record. As the ALJ concluded, Plaintiff's "musculoskeletal pain complaints appear to be considerably out of proportion to the very minimal objective medical findings of her physical examinations and MRI studies." (Tr. 13K). As the ALJ also observed, Plaintiff "has been prescribed essentially conservative therapy for her conditions." (Tr. 13K). As the ALJ further observed, "examining medical sources have noted that [Plaintiff's] pain complaints are far out of proportion to the objective tests and medical

24

findings." (Tr. 13L). Finally, as the ALJ also observed, the record contains substantial evidence that Plaintiff was engaged in drug-seeking behavior, which certainly detracts from her credibility. (Tr. 13L). In sum, the ALJ's decision to accord limited weight to Plaintiff's subjective allegations is supported by substantial evidence.

        c.        The ALJ Properly Relied on the Vocational Expert's Testimony

Plaintiff also asserts that the ALJ relied upon the response to an inaccurate hypothetical question. While the ALJ may satisfy his burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996).

The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's limitations, to which the vocational expert indicated that there existed approximately 25,900 such jobs. Because there was nothing improper or incomplete about the hypothetical questions he posed to the vocational expert, the ALJ properly relied upon his response thereto.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence. Accordingly, it is recommended that the Commissioner's decision be **affirmed**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date: August 12, 2011                          /s/ Ellen S. Carmody
                                               ELLEN S. CARMODY
                                               United States Magistrate Judge